UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:12-CV-323-F

LOGAN DEVELOPERS, INC. D/B/A,    )
LOGAN HOMES,                     )
                                 )
            Plaintiff,           )
                                 )
    v.                           )                    ORDER
                                 )
HERITAGE BUILDINGS, INC.,        )
VIVEK SIKKA, ROBERT GARY,        )
and ELIZABETH GARY,              )
                                 )
            Defendants.          )

This matter is before the court on the parties' cross motions for summary judgment [DE-55, -59]. The motions have been fully briefed and are ripe for resolution. For the reasons that follow, Heritage's motion for summary judgment is ALLOWED as to each of the remaining claims and this case is DISMISSED.

## I. PROCEDURAL AND FACTUAL BACKGROUND

Logan Developers initiated this action on November 9, 2012 by filing a complaint [DE-1] in this court. The complaint alleged claims for copyright infringement, trademark infringement, and state law unfair and deceptive trade practices. In its September 30, 2013 order [DE-54], the court dismissed the trademark infringement and state law unfair trade practices claims. Heritage now moves for summary judgment on the remaining copyright infringement claims. Logan cross-moves for partial summary judgment as to liability.

Logan Developers d/b/a Logan Homes ("Logan") designs and constructs residential homes in Wilmington, N.C. and the surrounding communities. Heritage Buildings ("Heritage"), owned by Defendant Vivek Sikka ("Sikka"), is also in the home design and construction business in the Wilmington area and is one of Logan's competitors. Heritage and Logan both build homes in the Compass Pointe Community, an upscale residential housing community located just outside of Wilmington. At the time of the alleged infringement in this case, Logan displayed a model home of its Ocracoke design in Compass Pointe. Logan has obtained technical drawings and architectural works copyright registrations for the Ocracoke design.

Defendants Robert and Elizabeth Gary ("the Garys") began searching for homes in the Wilmington area in 2010. The Garys search included the Compass Pointe community, where the Garys toured both the "Wrightsville I" and "Ocracoke" models (both displayed by Logan) and received brochures describing both models. The Garys informed sales staff at Compass Pointe that they had settled on either the Ocracoke or two other designs not relevant to this case. According to Logan, a staff member at Compass Pointe who was friendly with Mr. Sikka suggested the Garys hire Heritage to build their home.

On or about March 28, 2012, Mr. Sikka met with the Garys outside the gate of Compass Pointe and discussed the Garys' preferences for their home. Mr. Sikka made handwritten notations on an underlying floor plan design, which turned out to be the Creekwood, a plan Heritage licenses from architect Larry James. Ultimately, the Garys purchased a lot in the Compass Pointe community and hired Heritage to construct their new home. After construction on the Garys' home began in August, 2012, Logan became aware that Heritage was building an alleged copy of the Ocracoke on the Gary lot. Heritage named the Gary home design the

2

"Southport." Logan alleges that the Garys obtained the design for the Ocracoke while searching for homes and provided it to Heritage as a model for their prospective home. Heritage allegedly copied the design, made minor modifications, and produced the competing Southport and Cambridge designs. In addition to using the design to construct the Gary home, Heritage advertises the Southport and Cambridge designs on its website to this day, stamped with Heritage's company seal and copyright information. After Heritage ignored numerous cease and desist letters, Logan initiated this suit.

The Southport and the Ocracoke employ a relatively standard modern home design consisting of an open floor plan with three bedrooms on the right side of the home and the garage, open kitchen/dining area and the living room on the left side.[1] Both designs contain a two-car garage located at the front of the homes with the entrances to the garages on the left sides of the homes. Both homes contain a "garage bump out": viewing the homes from the street (the front view), the left front portion of both homes protrudes out towards the street to allow room for the garages. On the right front portion, both homes contain front double doors and (moving left to right) front bedroom windows. The rear portion of both homes contain asymmetrical lanai, which are open-sided, covered patios. The Ocracoke features an outdoor kitchen in the lanai area, but the Southport does not.

The interiors of both homes also contain a number of similarities. In addition to the open floor plans with three bedrooms on one side, both plans include the following features: a niche located at an angled wall in the foyer that allows for display of personal items; an arch with a

---

[1] The floor plans and artist renderings of the exterior of both homes are attached as Addendum I and Addendum II, respectively.

keystone above the front entry; set-off spaces with angled walls that lead to the guest bedrooms and guest bath; transom windows over the tub/shower in the guest bath; an angled island containing a sink in the kitchens; tray ceilings (octagonal-shaped cutouts in the ceilings); bi-hinge doors on the guest room closets; an asymmetrical dining area; and bookshelves flanking the fireplace. Conversely, the plans are also different in some respects: the master bathrooms and master bedrooms are in different locations; the master bathrooms differ with respect to arrangements of fixtures and number of windows; the storage area, garage and kitchen are all flush with each other in the Southport, whereas in the Ocracoke the utility room protrudes into the kitchen and the storage area protrudes into the garage.

## II. STANDARD OF REVIEW

At summary judgment, the court must examine the evidence presented by both parties and determine if there is a need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Greater Balt. Ctr. for Pregnancy Concerns, Inc.* v. *Mayor & City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013). The court examines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-53 (1986). Where the moving party shows that the evidence is so one-sided that it should prevail as a matter of law, the burden shifts to the nonmoving party to come forward with affidavits, depositions, answers to interrogatories, or other evidence demonstrating that there is a genuine issue of material fact that requires trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986); *Matsushita*, 475 U.S. at 587; *Pension Ben. Guar. Corp. v. Beverly*, 404 F.3d 243, 246-47 (4th Cir. 2005). An issue of fact is genuine if a reasonable jury could find for the nonmoving party.

4

*Liberty Lobby*, 477 U.S. at 248. A fact is material if proof of the fact might affect the outcome of the case under the substantive law. *Id.* The facts should be viewed in the light most favorable to the nonmoving party and all reasonable inferences should be made in favor of the nonmoving party. *Id.* at 255; *Smith v. Va. Commonwealth Univ.*, 84 F.3d 672, 675 (4th Cir. 1996).

## III. SUBSTANTIAL SIMILARITY

### A. Copyright Law Overview

Copyright infringement occurs when a defendant copies "the original elements" of the plaintiff's copyrighted work. *Universal Furniture v. Collezione Europa USA*, 618 F.3d 417, 435 (4th Cir. 2010). Because direct evidence of copying rarely exists, a plaintiff may create a presumption of copying by showing both "substantial similarity" between the two works and access to the plaintiff's copyrighted material.[2] *Id.*; *Lyons P'ship v. Morris Costumes, Inc.*, 243 F.3d 789, 801 (4th Cir. 2001). Substantial similarity, in turn, is a "two-pronged inquiry" that questions whether the works are extrinsically and intrinsically similar. *Universal Furniture*, 618 F.3d at 435. In *Universal Furniture*, the Fourth Circuit described the extrinsic and intrinsic tests as follows:

> Substantial similarity is a two-pronged test. The plaintiff must show that the two works are (1) "extrinsically similar because they contain substantially similar ideas that are subject to copyright protection" and (2) "intrinsically similar in the sense that they express those ideas in a substantially similar manner from the perspective of the intended audience of the work." *Id.*

*Id.* (quoting *Lyons*, 243 F.3d at 801). The extrinsic similarity analysis is an objective inquiry that focuses on the similarity of the protected elements of the two works. *See id.* at 436. Expert testimony may be useful under the extrinsic portion of the test. *Id.* at 435.

---

[2] Heritage does not request summary judgment on the basis of access.

5

In contrast, the intrinsic analysis considers the "total concept and feel" of the works and proceeds from the perspective of the work's intended observer. *See id.* at 436; *Dawson v. Hinshaw Music, Inc.*, 905 F.2d 731, 733 (4th Cir. 1990). The intrinsic similarity inquiry asks whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Universal Furniture*, 618 F.3d at 436 (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960)). Importantly, "analytic dissection of protected and unprotected elements is inappropriate under the intrinsic prong, given that the ordinary observer does not make this distinction." *Universal Furniture*, 618 F.3d at 437 (internal quotation marks omitted); *Charles W. Ross Builder, Inc. v. Olsen Fine Home Bldg., LLC. ("Ross I")*, 496 F. App'x 314, 320 (4th Cir. 2012). Thus, under the intrinsic portion of the test, the court must not "set out to detect the disparities" between the works or compare only the protected elements of the two works. *Universal Furniture*, 618 F.3d at 436, 437; *Ross I*, 496 F. App'x at 320. The intrinsic similarity analysis generally does not require expert testimony. *Towler v. Sayles*, 76 F.3d 579, 583-84 (4th Cir. 1996); *Ross I*, 496 F. App'x at 319. In *Ross I*, the Fourth Circuit recently held that the substantial similarity test from *Universal Furniture* applies in the context of copyright infringement claims involving architectural works. *Ross I*, 496 F. App'x at 320.

**B. Extrinsic Similarity and the Architectural Works Copyright Protection Act**

Because the extrinsic similarity test questions "whether the two works 'contain substantially similar ideas that are subject to copyright protection[,]'" *Ross I*, 496 F. App'x at 318 (quoting *Lyons*, 243 F.3d at 801), the extrinsic portion of the test requires comparison of the protected elements of the two works. *See Universal Furniture*, 618 F.3d at 436 (explaining

6

extrinsic test focuses exclusively on comparison of "copyrightable aspects" of the works); *Charles W. Ross Builder, Inc. v. Olsen Fine Home Bldg., LLC. ("Ross II")*, — F. Supp. 2d — , 2013 WL 5461841, at *21-22 (E.D. Va. 2013) (opinion on remand) (explaining, in architectural works copyright case, that "[o]nce the protectable elements of the [two works] are identified, the Court can then assess whether [the protected elements] are substantially similar [under the extrinsic portion of the test]"); *see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 348 (1991) ("The mere fact that a work is copyrighted does not mean that every element of the work may be protected.")*.*  Therefore, the court must first identify the protected aspects of Logan's Ocracoke design and compare only those elements with the corresponding elements in Heritage's Southport design.  To identify the protected elements of these designs, the court examines the Architectural Works Copyright Protection Act ("AWCPA").  *See Interest Const., Inc. v. Canterbury Estate Homes, Inc.*, 554 F.3d 914, 919 (11th Cir. 2008) (examining AWCPA to determine protectable aspects of architectural works); *Ross II*, 2013 WL 5461841, at *21-22 (analyzing various provisions of the AWCPA and the legislative history for purposes of identifying the protected elements of architectural works).

In 1990, Congress enacted the Architectural Works Copyright Protection Act ("AWCPA"), which amended the Copyright Act, 17 U.S.C. §§ 101-122, and extended copyright protection to "architectural works."  Architectural works are defined as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings."  17 U.S.C. §§ 101, 102(a)(8).  Protected elements of an architectural work include "the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features."  § 101.  Individual standard features,

7

in turn, include such elements as "common windows, doors, or other staple building components." H.R. Rep. No. 101-735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935, 6949.

Distinguishing protected and unprotected aspects of a particular architectural plan can be a complicated undertaking, especially where, as here, substantial portions of the plans are in the public domain. *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 143 (4th Cir. 2000); *Ross II*, 2013 WL 5461841, at *23; *Trek Leasing, Inc. v. United States*, 66 Fed. Cl. 8, 12-16, 20-21 (Ct. Fed. Cl. 2005) . As Logan stresses, the legislative history notes that "creativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotectible elements into an original, protectible whole." H.R. Rep. No. 101-735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935, 6949. However, that does not mean the AWCPA affords protection to the every element of a copyrighted design. As the statute and the implementing regulation make clear, "individual standard features" and "standard configurations of spaces" are not protected. § 101; 37 C.F.R. § 202.11(d)(2). This is so because "[a] grant of exclusive rights in such features would impede, rather than promote, the progress of architectural innovation." H.R. Rep. No. 101-735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935, 6949. As Congress recognized, the definition of architectural works is intended to "give the courts some guidance regarding the nature of . . . protected matter" but the scope of protection in an individual case is "to be made on an *ad hoc* basis" by the court. H.R. Rep. No. 101-735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935, 6952; *Ross II*, 2013 WL 5461841, at *22 (same).

Because the extrinsic test involves comparing the protected aspects of the works, the court must disregard the unprotected elements in the two designs before comparing them for extrinsic similarity. *See Universal Furniture*, 618 F.3d at 436; *Lyons*, 243 F.3d at 801.

Accordingly, individual standard features are not protected and must be factored out before comparing the works. *See* § 101. Similarly, "standard configurations of spaces" such as those found in architectural styles in the public domain must also be factored out. *See Ross II*, 2013 WL 5461841, at *23; *Trek Leasing*, 66 Fed. Cl. at 12-16, 20-21. This process creates some tension with the statutory language, which indicates that the protected aspects of architectural works include "the overall form as well as the arrangement and composition of spaces and elements in the design . . . ." § 101; *see also* H.R. Rep. No. 101-735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935, 6949 (noting "creativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotectible elements into an original, protectible whole"). However, because Congress and the regulatory agency excluded individual standard features and standard configuration of spaces from the definition of protected material, the court concludes that these elements must be factored out before comparing the works for extrinsic similarity.

Logan also argues that this approach is inconsistent with *Ross I*. As noted above, in *Ross I* the Fourth Circuit held that the extrinsic/intrinsic test for substantial similarity applies to copyright infringement claims involving architectural works. *Ross I*, 496 F. App'x at 320. In the course of that opinion, the Fourth Circuit noted

> The effect of the district court's failure to apply this Court's test for determining substantial similarity is that throughout its analysis, the district court relied on its finding that many of the similarities between the Bainbridge model and the Rubin residence related to non-protected elements of those works. Thus, in segregating these non-protected similarities, the district court deviated from the essential principle of the intrinsic component of our two-part test, namely, that a court is not to "set out to detect the disparities," or engage in "analytic dissection of protected and unprotected elements." *Universal Furniture,* 618 F.3d at 436, 437.

*Id.* at 320. Logan's argument fails to account for the fact that this language applies solely to the intrinsic portion of the substantial similarity test. *See id.* ("[T]he district court deviated from the essential principle *of the intrinsic component of our two-part test . . . .*" (emphasis added)). Notwithstanding some rather broad language in *Ross I*, the opinion does not stand for the proposition that Logan advocates here—that the district courts in this circuit may not disaggregate the protected and unprotected elements of two architectural designs and compare the works solely on the basis of the protected elements in the designs under the extrinsic portion of the test.

In addition to factoring out the unprotected portions of the works, the court must also identify the protected elements. Of course, truly original elements of the design are protected. *Feist*, 499 U.S. at 348 ("Originality remains the *sine qua non* of copyright."). However, when dealing with standard features and architectural styles in the public domain, truly original elements may be hard to find. *See Ross II*, 2013 WL 5461841, at *21-23; *Trek Leasing*, 66 Fed. Cl. at 12-16, 20-21. As noted above, the statutory language suggests "the arrangement and composition of spaces and elements in the design" are protected. § 101. However, the "arrangement and composition of spaces and elements" cannot be defined at such a high level of generality that the plaintiff claims infringement of an unprotected idea or concept. *See Ale House*, 205 F.3d at 143 ("[The plaintiff] appears to be claiming, not that [the defendant] infringed on a particular plan, but that it copied the concept of using an island or peninsula-shaped bar to bisect a seating area which has booths on one side and stool seating on the other. But at this level of generality, the [plaintiff's] design is nothing more than a concept, as distinct from an original form of expression, and is not copyrightable."); *see also Howard v. Sterchi*, 974

10

F.2d 1272, 1276 (11th Cir. 1992) ("[A]though the floor plans are visually similar and the layout is generally the same, the dissimilarities are significant, particularly the roof lines, the bay window and the dimensions. . . . [T]he variety of ways a . . . rectangle can be divided . . . is finite. In architectural plans of this type, modest dissimilarities are more significant than they may be in other types of art works."). For this reason, analyzing the "arrangement and composition of spaces and elements" for extrinsic similarity in the context of works that borrow heavily from the public domain requires a relatively precise definition of this statutory language.

In *Ale House*, the Fourth Circuit relied on differences between the "size and proportion of the seating areas," the "placement of the pool tables" and the "dimensions and proportions" of the bars in holding that the plans were not substantially similar. *See Ale House*, 205 F.3d at 143. Relying on *Ale House*, the court construes the statutory language "the arrangement and composition of spaces and elements" as referring primarily to the size, dimensions, and proportions of the spaces in a copyrighted design, at least in the context of works that borrow heavily from the public domain. *See id.*; *Sterchi*, 974 F.2d at 1276 (examining differences in dimensions between otherwise similar architectural plans). However, to the extent the physical "arrangement of spaces and elements" does not consist of "standard configuration of spaces," *see* 37 C.F.R. § 202.11(d)(2), the court will also consider the arrangements of features and rooms in the design protected. § 101. Thus, if Heritage copied the dimensions and proportions of Logan's plan or protected arrangement of spaces, then the works will be considered extrinsically similar. However, in accordance with *Ale House*, because these works borrow heavily from the public domain, modest dissimilarities in the size, dimensions, proportions, or arrangement of spaces

11

between the designs may defeat a claim of substantial similarity. *See Ale House*, 205 F.3d at 143.

## C. Extrinsic Similarity - Ocracoke v. Southport

Having provided a general overview of the court's view of the extrinsic similarity test for architectural works, the court proceeds to apply these principles. Doing so, the court draws heavily from Heritage's briefing [DE-60, -64], which in the court's view articulated the correct legal standard and appropriately applied that standard. As noted above, the first step involves factoring out the unprotected elements of the two plans. *See Universal Furniture*, 618 F.3d at 436. Both individual standard features and elements derived from the architectural style must be factored out. § 101; *Ross II*, 2013 WL 5461841, at *21-23; *Trek Leasing*, 66 Fed. Cl. at 12-16, 20-21.

A number of the features Logan claims Heritage copied are individual standard features that are not subject to copyright protection. These include: niches placed in angled walls, *see Ross II*, 2013 WL 5461841, at *22; angled walls that make up part of a foyer, *see* Floor Plan Compilation [DE-58-19] at 8, 16 (showing floor plans from other builders using this feature); tray ceilings, *see id* at 4, 6-13, 16-22; the use of double or "French" doors for the front doors or the bedroom doors, *see Ross II*, 2013 WL 5461841, at *22, Floor Plan Compilation [DE-58-19] at 5, 8-10, 12, 15, 23, 25; the use of an arch with a keystone entry, *see* Floor Plans [DE-58-11, -20, -21]; the use of built-in bookshelves on either side of the fireplace, *see* Floor Plan Compilation [DE-58-19] at 4, 6, 10, 30; use of angled kitchen islands, *see* Linden Plan [DE-58-4]; Floor Plan Compilation [DE-58-19] at 5-9, 12-17; a transom window over a shower or tub, *see* Floor Plan Compilation, [DE-58-19] at 4-15. The use of these same features in a variety of

home designs indicates they are all standard features that must be factored out for purposes of the extrinsic similarity analysis.

Logan also complains that Heritage copied the closet placements in the bedrooms. However, as Heritage notes, closet placement cannot possibly be a protected feature. As there are only four possible walls on which a closet can be placed in any given room, many architectural designs will necessarily include closet placement on the same wall. Thus, the court finds that closet placement is a standard feature that must be factored out. *See* H.R. Rep. No. 101-735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935, 6949 (explaining standard features such as "common windows, doors, or other staple building components" are not protected).

The Ocracoke employs a standard architectural style used by architects and builders throughout the country. As Heritage notes, Logan does not have a copyright in a standard open-concept floor plan with three bedrooms running along one side of the home. *See* Floor Plan Compilation [DE-58-19] (providing thirty-one pages of floor plans from multiple different builders and architects using this architectural style); *see also Jeff Benton Homes v. Alabama Heritage Homes, Inc.*, 929 F. Supp. 2d 1231, 1254 (N.D. Ala. 2013) ("It would be unduly restrictive—and would cut against the policy favoring the free flow of ideas and information—to grant plaintiff a monopoly on the design of a roughly 3,000 square-foot home plan using a square box design [and] open floor plan . . . ."). Thus, because the Ocracoke borrows heavily from the public domain, the elements common to this architectural style (and thus, in the public domain) are also not protected and must be factored out before considering whether the works are extrinsically similar. *See Ross II*, 2013 WL 5461841, at *23; *Trek Leasing*, 66 Fed. Cl. at 12-16, 20-21.

13

Here, these elements include: the general plan layout of three bedrooms running along one side of the house and an open kitchen/dining/great room area on the other, *see* Floor Plan Compilation [DE-58-19]; a set-off asymmetrical eating space facing a covered porch, *see id.* at 8-10, 16, 17, 23 (providing examples of floor plans in this architectural style using this feature); the use of asymmetrical porches or lanai, *see id.* at 8-12, 26; Kenan Plan [DE-58-31]. Logan also alleges that Heritage copied the "sub-foyer." However, Logan fails to identify the sub-foyer in the documents submitted to the court, making it impossible to compare this feature between the plans. To the extent Logan refers to the angled set-off spaces that lead to the guest bedrooms and guest bath, that feature is also common to this style of architecture and is not protected. *See* Floor Plan Compilation [DE-58-19] at 8, 23, 25, 27, 28; Bill Clark Home [DE-58-32].

Because all of the features described above, including the general layout of the plan, are either standard features or features common to this architectural style and therefore not protected, the court disregards all of them for purposes of the extrinsic similarity analysis. *Universal Furniture*, 618 F.3d at 436; *Ross II*, 2013 WL 5461841, at *21-24. Because Logan has not identified any stand-alone features entitled to copyright protection and the general layout of this plan is not protected, the court focuses on the protected aspects of the "arrangement and composition of spaces" in the design for purposes of the extrinsic similarity analysis. *See* § 101. As explained above, because these plans are both based on standard architectural styles in the public domain, "modest dissimilarities" in the dimensions and proportions of the plans or arrangement of features suggests they are not extrinsically similar. *See Ale House*, 205 F.3d at 143.

14

Heritage's expert report provides an extensive list of the differences in the plans' dimensions and proportions and the placement of features and Logan does not seriously contest that the plans are different at this level of expression. *See* Expert Report of David Bennett [DE-57-1] at 11-18; Logan Resp. Mem [DE-61] at 10-17 (failing to address Heritage's list of different dimensions, proportions, and arrangement of features and focusing instead on similarities between non-protected aspects of the plans). To avoid providing an exhaustive list of dimensions, proportions, and arrangements of features, the court attaches that portion of the report as Addendum III. To summarize, virtually every room in the two plans has different dimensions, including the front bedrooms, middle bedrooms, great rooms, dining areas, kitchens, master closets, master baths, foyers, utility rooms, and the storage rooms. In many cases, the differences are over a foot in width/length. For example, the master closet in the Southport is 5'6 ½" x 16'0" versus 10'8" x 6'0" in the Ocracoke. In other instances, the differences are relatively slight and may not be visible to the naked eye. However, as explained above, even modest dissimilarities in dimension and proportion may defeat a claim of substantial similarity when the two works draw heavily from the public domain. *See Ale House*, 205 F.3d at 143; *Sterchi*, 974 F.2d at 1276.

Heritage's expert report also compiles a list of the different arrangement of features in the two plans. In summary, a number of features are arranged differently in the two plans or completely absent from one plan but present in the other. For example, the master baths are arranged completely differently: the rooms are in different locations in the two plans and they have different arrangements of fixtures and different numbers of windows. The master bedrooms are in different locations in the two plans. In the Southport, the lower kitchen, great room wall,

15

utility room, and stairs are flush with each other; but in the Ocracoke the utility room protrudes into the kitchen and the storage area protrudes into the garage. These are just some of the many differences in the arrangement of features between the two plans. *See* Bennet Report [DE-57-1] at 11-18 (attached to this opinion as Addendum III).

Based on the foregoing, the court concludes that these plans are not extrinsically similar. Factoring out the standard features and the general layout, the plans have substantial dissimilarities at the level of protected expression: the dimensions and proportions of the rooms and the protected arrangement of spaces. No reasonable, properly instructed jury could find that these plans are extrinsically similar at the level of protected expression.

## D. Intrinsic Similarity - Ocracoke v. Southport

Having found that these plans are not extrinsically similar, the court turns to the intrinsic similarity portion of the analysis.[3] As explained above, the intrinsic similarity test considers the "total concept and feel" of the works and proceeds from the perspective of the work's intended observer. *See Universal Furniture*, 618 F.3d at 436; *Dawson*, 905 F.2d at 733. The intrinsic similarity inquiry asks whether "the ordinary observer, unless he set out to detect the disparities,

---

[3] Because the Fourth Circuit describes the substantial similarity test as requiring both extrinsic and intrinsic similarity to show infringement, *see Universal Furniture*, 618 F.3d at 435, presumably the court is not required to complete the intrinsic analysis if it finds that the works are not extrinsically similar. *See also Shaw v. Lindheim*, 919 F.2d 1353, 1358 (9th Cir. 1990) (explaining that a finding that two works are not extrinsically similar as a matter of law is sufficient, standing alone, to award summary judgment in Defendant's favor). However, in light of the holding in *Ross I*, the court finds it prudent to also complete the intrinsic similarity analysis. *See Ross I*, 496 F. App'x at 320 ("The effect of the district court's failure to apply this Court's test for determining substantial similarity is that throughout its analysis, the district court relied on its finding that many of the similarities [between the two works] related to non-protected elements of those works. Thus, in segregating these non-protected similarities, the district court deviated from the essential principle of the intrinsic component of our two-part test, namely, that a court is not to 'set out to detect the disparities,' or engage in 'analytic dissection of protected and unprotected elements." (quoting *Universal Furniture*, 618 F.3d at 436, 437)).

16

would be disposed to overlook them, and regard [the two works'] aesthetic appeal as the same." *Universal Furniture*, 618 F.3d at 436 (quoting *Peter Pan Fabrics*, 274 F.2d at 489). Under the intrinsic portion of the test, the court does not compare the works based solely on the protected elements. *Universal Furniture*, 618 F.3d at 436, 437; *Ross I*, 496 F. App'x at 320.

The court has considered plans (Addendum I), the artist renderings of the exteriors of the two homes the floor (Addendum II), and the photographs of the two homes contained in Heritage's brief (DE-64, at 17). The court finds that a lay member of the public would not consider the "total concept and feel" of these works substantially similar. With respect to the exterior of the homes, the Ocracoke contains large windows on the left side of the home while the Southport has only one window. *See* Addendum I. The shapes of the roofing on both homes is also much different: the angles of the Southport's roof are much flatter than the Ocracoke's sharply angled roof. *See id.* An ordinary observer would not be "disposed to overlook" these differences. *Universal Furniture*, 618 F.3d at 436.

With respect to the interior of the homes, the court acknowledges that the floor plans are somewhat similar in terms of the "total concept and feel." However, given the different locations of the master baths, the master bedrooms, the fact that the dimensions of some of the rooms are significantly different, and the different exterior "feel" of the two homes, the court finds that a lay observer would not consider these plans substantially similar. Furthermore, the court agrees with the *Ross II* court's observations regarding the intrinsic similarity test in the context of architectural works based on standard designs:

> As with most modern homes, [the two plans] have a front door, windows, and a garage. The interiors are also similar . . . . In the Court's view, even a lay person would have enough sense to know that they should not find that two homes are substantially similar in "total concept and feel" based on such superficial

17

commonalities. To hold otherwise would negate the intrinsic inquiry in the architectural context, as there would rarely be a case where the jury would not find two homes to be substantially similar in total concept and feel."

*Ross II*, 2013 WL 5461841, at *25. The court agrees with these sentiments and finds that a lay observer would discount similarities in the overall layout of these plans and in many of the standard features of the homes because these aspects of the plans are present in nearly every floor plan that follows this architectural style. Accordingly, the court finds that these works are not intrinsically similar.

To summarize, the court finds that the two plans are not extrinsically similar at the level of protected expression. Factoring out the standard features and the elements common to the style of architectural, nearly every other aspect of the plans are dissimilar. The court also finds that a lay observer would also discount the common design elements found in these plans, and find that the works are not otherwise intrinsically similar.

## IV. INDEPENDENT CREATION

As an alternative basis for granting summary judgment in favor of Heritage, the court also finds that Heritage has provided sufficient—and unrebutted—evidence of independent creation of the Southport. "[T]he defendant may rebut the presumption [of copying] with evidence of independent creation." *Keeler Brass Co. v. Continental Brass Co.*, 862 F.2d 1063, 1065-66 (4th Cir. 1988); *Watkins v. Chesapeake Custom Homes, L.L.C.*, 330 F. Supp. 2d 563, 575 (D. Md. 2004) (granting summary judgment on the basis of independent creation and noting "[e]vidence of substantial similarity and access presents a prima face case of copying. However, that presumption is rebutted where the defendant presents evidence that the allegedly infringing work was 'independently created.' . . . This is true even if the infringing work is 'practically identical'

18

to the copyrighted work."); *Comins v. Discovery Commc'ns, Inc.*, 200 F. Supp. 2d 512, 521 (D. Md. 2002) (granting summary judgment on basis of independent creation evidence).

Heritage presents a compelling case for independent creation. In Heritage's brief in support of summary judgment [DE-60], Heritage explains in detail the process by which Mr. Sikka created the Southport. *Id.* at 12-16. In short, Heritage presents evidence of how the Southport is a derivative of the Linden, Creekwood, and Pembroke, all plans that Heritage either owns outright or licenses from other architects/builders. Almost every feature of the Southport is accounted for in Heritage's description of the combination of these three plans to create the Southport.

Logan offers no evidence that would rebut Heritage's independent creation account. Logan argues at length that some features found in the Southport are not found in the Linden, and that is correct. But that is because those features come from the Creekwood, not the Linden. Logan's failure to account for the Creekwood's influence on the Southport is inexplicable given Heritage's extensive description of how Mr. Sikka combined elements from the Creekwood, Linden, and Pembroke to create the Southport. Accordingly, summary judgment on the basis of independent creation is warranted. *See Celotex*, 477 U.S. at 324-25 ("Where the moving party shows that the evidence is so one-sided that it should prevail as a matter of law, the burden shifts to the nonmoving party to come forward with affidavits, depositions, answers to interrogatories, or other evidence demonstrating that there is a genuine issue of material fact that requires trial."); *see also Keeler*, 862 F.2d at 1066 ("'If [the] defendant offers evidence of independent creation, the plaintiff has the burden of proving that the defendant in fact copied the protected material.'" (quoting *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1375 (5th Cir. 1981)).

19

Logan argues at length that the absence of iterative progress drawings showing that Heritage combined the Creekwood, Linden, and Pembroke to create the Southport establishes at least a genuine issue of material fact on the independent creation issue.  As part of discovery, Logan requested all progress drawings used to create the Southport floor plan.  Heritage produced only a marked-up version of the Creekwood plan, which Mr. Sikka completed when he first met with the Garys outside Compass Pointe, and the finished Southport plan.  Heritage maintains that neither Heritage nor the Garys could have possibly known that Logan would accuse them of copyright infringement at the time they developed the Southport and thus (either practically speaking or as a matter of any legal duty) they could not be expected to have saved the progress drawings.

The court agrees.  In the absence of a legal duty to retain the documents (and Logan offers no argument on this issue), the absence of iterative progress drawings does not create a genuine issue of material fact on the independent creation issue.  As explained above, Heritage offers compelling evidence of independent creation.  The burden then shifts to Logan to show that Heritage copied the work notwithstanding the evidence of independent creation.  *Keeler*, 862 F.2d at 1066.  In the absence of actual spoliation, pointing to the absence of evidence that a party feels would support its claim does not suffice to carry that party's burden of persuasion.  *Cf. Penalty Kick Mgmt. Ltd. v. Coca-Cola Co.*, 318 F.3d 1284, 1293-94 (11th Cir. 2003) (finding "no support in the law" for argument that absence of evidence that would theoretically support a party's position requires court to draw inferences in favor of the moving party, in the absence of spoliation).  Accordingly, Heritage is also entitled to summary judgment on basis of independent creation.

## V.  MOTION TO SEAL

The parties have also submitted a consent motion to seal docket entries 66-2 and 66-3.

Consent Mot. to Seal [DE-68].  This motion does not comply with Local Rule 79.2(a), which

provides that any "party desiring to file a document under seal must first file a motion seeking

leave in accordance with Section T of the CM/ECF <u>Policy Manual</u>."  Local Civil Rule 79.2(a).

Section T of the CM/ECF Policy Manual, in turn, provides in relevant part the following:

> In the event that a filing party seeks to file materials that have been designated
> confidential by another party or individual, the filing party shall provisionally file the
> materials under seal in accordance with Local Civil Rule 79.2 . . . with notice served
> on the party or individual who desires to maintain the materials under seal.
>
> (i)      The filing party is required to file a notice of filing pursuant to this
>          subsection, in lieu of filing a motion to seal, which must be docketed after the
>          filing of the sealed material and link back to the entry or entries being filed
>          under seal.  The filing party need not file a motion to seal or otherwise defend
>          another party or individual's request that the materials remain sealed and the
>          filing of the materials under seal shall not be binding on the court.
>
> (ii)     Within seven (7) days after service of such notice, the party or individual
>          desiring that the materials be maintained under seal shall file a motion to seal
>          and supporting memorandum in accordance with Section T(1)(a)(1) [of the
>          CM/ECF Policy Manual].
>
> (iii)    Documents submitted under seal in accordance with this subsection will
>          remain under seal pending the court's ruling on the motion to seal.  If the
>          party desiring that the information be maintained under seal does not timely
>          file a motion to seal, then the materials will be deemed unsealed, without
>          further order of the court.

Section T(1)(a)(6), CM/ECF Policy Manual, *available at*

http://www.nced.uscourts.gov/cmecf/default.aspx.  In this case, Logan has complied with the rule

in substance.  Logan filed a "motion to seal" these exhibits because Heritage had marked the

exhibits "confidential" when they were disclosed in discovery.  Under section T(1)(a)(6), Logan

should have denominated its motion a "notice of filing" instead of a motion to seal.  However,

because the "motion to seal" essentially provides the same notice that a "notice of filing" would, the court will deem this filing a "notice of filing" under section T(1)(a)(6).

Under section T, Heritage had seven days to file a proper motion to seal and accompanying memorandum. Heritage apparently assumed that its consent to the motion to seal was sufficient for the court to seal the documents. That is not correct. Almost every request to seal documents in this Circuit must be accompanied by a showing that the need for sealing overcomes the public's right of access. *See Doe v. Public Citizen*, — F.3d —, 2014 WL 1465728 (4th Cir. 2014). If Heritage wants these documents sealed, it must carefully review Section T of the CM/ECF policy manual, the Local Rules, and the case law delineating the showing necessary to overcome the public's right of access. In the event Heritage wishes to pursue sealing these documents, Heritage must file an appropriate motion to seal with an accompanying memorandum of law within seven days of the date this order is filed. If no motion to seal is filed within this time frame, the Clerk of Court will unseal these documents.

## VI. CONCLUSION

Heritage's motion for summary judgment [DE-59] is ALLOWED in its entirety. Because the court concludes that the Southport is not an infringing copy of the Ocracoke, the primary copyright infringement claims (counts 1 and 2) are DISMISSED. The Digital Millennium Copyright Act claim, the contributory infringement claim against the Garys, and the permanent injunction claim (counts 3, 4, and 8) are also DISMISSED because they depend on a finding that the Southport infringes the Ocracoke. Logan's motion for summary judgment [DE-55] is DENIED. The motion to seal [DE-68] is DENIED WITHOUT PREJUDICE to Heritage to submit a properly-supported motion to seal within seven calendar days from the date this order is

entered on the docket. In the event no motion to seal is filed within that time frame, the Clerk of Court is DIRECTED to unseal docket entries 66-2 and 66-3. The Clerk of Court is DIRECTED to close this case.

SO ORDERED.

This the 4th day of June, 2014.

James C. Fox
JAMES C. FOX
Senior United States District Judge

## SOUTHPORT

## OCRACOKE



Southport Artist
Rendering



# THE OCRACOKE



## House Description

3 Bedrooms
2 Bathrooms
Screened Porch with Patio
Optional Bonus Room with or without Bath
Two-Car Garage

The Ocracoke is a charmer that will draw you in with its beautiful mahogany front door, stucco trim and coastal exterior accents. Customize your living space with options such as a bonus room, built-in shelving framing the fireplace, and a variety of entry options for the study or third bedroom. Retreat to the patio or screened porch from your master suite, or hide away upstairs in your bonus room. The Ocracoke's blend of form and function will truly be a place you can call "Home sweet home."

EX.50 Heritage 3Db6 depo Ocracoke HS 394-397

Exhibit PSI-M

HS_000395

# Addendum III: Portion of Hertiage's Expert Report

unique is its overall shape and flow. That is determined by the kitchen walls, which give the kitchen its perimeter and limits.

34.    After I dissected out common concepts and ideas, I compared the plans. After you get past the ideas used by many other plans, the Southport and Ocracoke are significantly different. These differences include, but are not limited to:

a. The overall elevations are different. During my initial review, the front elevations were so dissimilar that I disregarded it as an issue. Other than the most basic massing of the house (hip roof, general width), there is little to be compared. The basic massing of the house is too common place to be unique to any one builder. When comparing the elevations, I also noticed many differences, such as:

   i. The fenestrations do not match.

   ii. The Southport is entirely brick veneer on the front, while the Ocracoke is brick & Stucco. Although there are instances where sidings may be used in a unique manner, that is not the case here.

   iii. The Southport has all hipped roofs, while the Ocracoke is a combination of hips and open faced gables.

   iv. The Southport has a side dormer for a 2nd floor room. The plans for the Ocracoke show that the Ocracoke does not have a side dormer.

b. The Ocracoke has an outside kitchen area. The Southport does not.

c. The Southport has a tray ceiling in the dining area. The Ocracoke does not.

d. The Southport dining room "bay" is created by two walls. Ocracoke has a dining "bay" that is created by three walls.

11

e.  The dining area in the Southport does not have a door to the outside. In order to get outside from the dining area of the Southport, someone would have to walk to the Great Room or the Foyer. The Ocracoke has a door to the outside in the dining area.

f.  The Southport plans show a stairway to a second floor. No second floor or stairway are indicated in the Ocracoke plans.

g.  The Southport has a coat closet positioned beside the stairs and opening into the Foyer from the left. There is not a coat closet in this location in the Ocracoke. The coat closet in the Ocracoke is impeded in the closet configuration of the bedrooms and guest bath. In particular, it is placed between the study and the guest bath located right of the Foyer.

h.  The Ocracoke has an archway leading to the secondary bath and the middle bedroom (Bedroom 2). This feature is not in the Southport.

i.  The front right bedroom in the Southport has a flush front wall. Ocracoke's front room (labeled Study) has a boxed out section for the window.

j.  The Southport uses a shower in the secondary bath. The Ocracoke uses a tub-shower combination in the secondary bath.

k.  Although both the Southport and the Ocracoke include built in bookshelves on either side of the fireplace, the dimensions of the built in bookshelves are different. In the Southport, the bookshelves are 6'-2" and 5'-9" long; in the Ocracoke, the bookshelves are 5'-10" and 3'-1".

l.  The kitchen islands are located in different positions in the Southport and the Ocracoke. The Southport has the top edge of the island aligned with the side

12

counter. In the Ocracoke, the island is set so that its top edge is not aligned with the side counter. Instead, this top edge protrudes further into the dining area.

m. The Ocracoke kitchen places the refrigerator along the outer wall in the corner nearest the utility room. There is not a space for the refrigerator in this location in the Southport. Instead, there is a built in counter in this location.

n. The Southport has a pantry in the utility room. The Ocracoke places the pantry outside the utility room adjacent to ovens.

o. The Southport places the AHU in the Utility Room. The Ocracoke does not.

p. The configuration of the appliances in the utility rooms are different. The washer and dryer are placed opposite the slop sink in the Southport. In the Ocracoke, the washer and dryer are adjacent to the laundry sink.

q. The arrangement of space with the storage area, utility room, garage, and kitchen is different between the two plans. In the Southport, the utility room and stairs are flush along the lower kitchen/great room wall. The utility room and storage area are flush along the upper garage wall. In the Ocracoke, the utility room protrudes into the kitchen so that it is flush with the protruding ovens and pantry. The storage area is located beneath the ovens and pantry. The storage area protrudes into the garage, and is not flush with the utility room. The result is an entry area with doors leading to the utility and storage areas, as well as outside. This entry area configuration is not located in the Southport.

13

r. Although both the Southport and the Ocracoke have bump outs in the front garage wall, the locations of the bump outs are different. The bump out covers approximately the right half of the front garage wall in the Ocracoke. The bump out in the Southport is in the center of the front garage wall.

s. The Southport master bath is entirely different than that of the Ocracoke.

    i. The master baths are in completely different locations. In the Ocracoke, the master bath is located behind the Master Suite and projects outward from the back of the house. In the Southport, the master bath is located along the right side of the house between Bedroom #3 and the Master Suite/Closet.

    ii. The dimensions of the master baths are different. The dimensions of the Ocracoke's master bath are 16'-6 ½" x 12'-5 ½". The dimensions of the Southport's master bath are 16'-1"x 10'-0".

    iii. There is a door leading from the master bath onto the patio in the Ocracoke. The Southport master bath does not have a door to the outside of the home.

    iv. The arrangement of the fixtures in the master bath is different in the Southport and the Ocracoke. The Southport the shower and the tub are located in two corners on the same wall. The water closet is located above the shower. One sink is placed on an outer wall, while another sink is placed on an inner wall. In contrast, in the Ocracoke, the shower and tub are diagonal from each other. The water closet is

14

located to the left of the shower. The sinks are each on an outer wall of the bathroom.

v. The Southport has a single window in the master bath. The Ocracoke has two windows.

vi. The Southport master bath includes access to the master closet. This sort of configuration is desirable to some clients, as it allows one inhabitant to bathe and get dressed without waking an inhabitant sleeping in the master suite. The location of the master bath and master closet in the Ocracoke make this sort of access impossible.

t. The two Master Suites in these plans are so different. In particular:

i. The Master Suites are in different locations. In the Southport, the Master Suite is placed at the rear of the house, protruding from the right hand side. A closet is placed to the right hand side of the Master Suite. In the Ocracoke, the Master Suite is located along the right exterior wall, beneath the Master Bath and above the Master Closet.

ii. There is not direct access to the Master Closet from the Master Suite in the Southport. There is direct access to the Master Closet from the Master Suite in the Ocracoke.

iii. The Southport has the entrance to the Master Suite directly off the Great Room and in direct view of the front door. This is a poor design, in my opinion, as people entering the Southport can see into the Master Suite. The Ocracoke Master Suite entrance is more private. Entrance is obtained through an alcove to the right of the

15

Living/Great Room, which is a better design as it prevents visitors from seeing into the Master Suite.

iv. The Master Suite entrance nook in the Ocracoke contains a storage area nested behind one of the Living Room bookshelves. This feature is not found in the Southport.

u. The Master Closets are different between the Southport and the Ocracoke. In particular:

   i. The Master Closets are in different locations in the Southport and Ocracoke. The Southport places the Master Closet in the right, rear of the house, with the Master Suite to the left and the Master Bath beneath the Master Closet. In the Ocracoke, the Master Closet is placed beneath the Master Suite and above the middle bedroom (Bedroom 2).

   ii. The Master Closets have different dimensions. The dimensions of the Master Closet in the Southport are 5'-6 ½" x 16'-0". The dimensions of the Master Closet in the Ocracoke are 10'-8" x 6'-0".

   iii. The Master Closet in the Southport has an exterior window. This is desirable to some clients because it allows the client to see how clothing selections will appear in sunlight. There is no exterior window in the Ocracoke's Master Closet.

v. The Southport and Ocracoke have different widths. The Southport is 47' 4" wide. The Ocracoke is 47' 0" wide.

16

w. The Southport and Ocracoke have different depths. The Southport is 75' 6" deep. The Ocracoke is 82' 0" deep.

x. The room sizes in the Southport are different than in the Ocracoke. In particular:

    i. The front bedrooms (Bedroom #2 in Southport; Study in Ocracoke) are different. The front bedroom in the Southport has dimensions of 15'-6" x 11'-2". The front bedroom in the Ocracoke has dimensions of 14'-5" x 12'-0".

    ii. The middle bedrooms (Bedroom #3 in Southport, Bedroom 2 in Ocracoke) have different dimensions. The dimensions of the middle bedroom in the Southport are 13'-2 ½" x 11'-4". The dimensions of the middle bedroom in the Ocracoke are 12'-1 ½" x 12'-0".

    iii. As noted above, the Master Closet and Master Bath all different dimensions and locations between the two plans.

    iv. The Great Room dimensions are different between the two plans. In the Southport, the Great Room is 18'-8" x 19'-9 ½". In the Ocracoke, the Great Room is 17'-0" x 19'-11".

    v. The dining area dimensions are different. In the Southport, the dining area is 13'-2" x 11'-3". In the Ocracoke, the dining area is 13'-1" x 12'-2 ¾".

    vi. The kitchens have different dimensions. The Southport kitchen is 11'-4" x 12'-6". The Ocracoke kitchen is 12'-6" x 16'-5 ¾".

17

vii. The Foyers have different dimensions. The Foyer in the Southport is 8'-4" x 14'-0". The Foyer in the Ocracoke is 8'-0" x 13'-0".

viii. The utility rooms have different dimensions. The dimensions to the Southport's utility room are 10'-5" x 10'-1". The dimensions to the Ocracoke's utility room are 7'-8" x 7'-8".

ix. The storage areas have different dimensions. The storage area in the Southport is 11'-8" x 6'-5". The storage area in the Ocracoke is 15'-3 ½" x 10'-4".

35. In comparing the Southport and the Ocracoke, I do not see the Southport as substantially similar to or as an infringement of the Ocracoke. Once you remove the common plan concept used by many designers, the plans have different dimensions in each room.

36. I am informed that Professor Rand testified that the Ocracoke and Southport were substantially similar, but that, in reaching this determination, he treated the similarity analysis within the context of all architectural works and that he did not dissect out common elements or ideas, but included those in his analysis. I understand that Professor Rand testified that he did not do any survey or analysis of similar type plans in reaching his determination. The transcript of Professor Rand's deposition was not yet available at the time I drafted my opinion.

37. It is my opinion that it was an error not to dissect out common elements and ideas. No one designer has a copyright in common elements and ideas that are used by many designers in many plans.

38. It is also my experience that, the smaller the home, the more opportunity there will be for a design (completely or partially) to be inadvertently similar to another. You can get a certain number of rooms in a limited square footage in an acceptable manner only so many

18

ways. Because of this, it is important to distinguish between common ideas and elements versus the specific arrangement of elements and spaces.

I declare under penalty of perjury that the foregoing is true and correct.

David E. Bennett
September 20, 2013
Cary, North Carolina.

19